**UNITED STATES of America, Plaintiff,**

v.

**Horace E. HOLLIS, Defendant.**

**Crim. A. No. 74–82.**

United States District Court,
D. Delaware.

Jan. 17, 1975.

Ralph F. Keil, U. S. Atty., and Bruce L. Thall, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

David A. Drexler and Robert F. Stewart, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant.

## OPINION AND ORDER

LATCHUM, Chief Judge.

On September 10, 1974, the defendant, Horace E. Hollis, a previously convicted felon,[1] was charged with knowingly and unlawfully transporting a firearm [2] in interstate commerce in violation of 18 U.S.C. § 922(g)(1). Thereafter, the defendant entered a not guilty plea to the charge and on September 30, 1974 moved to suppress statements which he made to Special Agents of the FBI and to a Deputy Marshal immediately following his arrest at Newark, Delaware and during a subsequent interrogation in the FBI office in Wilmington, Delaware. The defendant's motion is based on the contention that his statements made to federal officers were involuntary and hence inadmissible because they were made while under the influence of drugs. Consequently, he argues that he was unable to knowingly and intelligently waive his Fifth Amendment right against self-incrimination.

In accordance with 18 U.S.C. § 3501(a), this Court held a hearing to determine the issue of the voluntariness of his statements. At that hearing Special

---

1. The indictment recites that the defendant entered a guilty plea to one count of an indictment that charged him with the violation of 18 U.S.C. § 2314, a crime punishable by a fine of up to $10,000 and/or imprisonment for a period of up to 10 years, and was subsequently sentenced for that charge on October 1, 1971. Thereafter, the defendant was released on parole from the Federal Penitentiary at Lewisburg, Pa. on January 9, 1974, and as of August 1974 was wanted by the federal authorities for parole violation. (Trial Transcript (Tr.) 16, 23, 78, 133).

2. The firearm was an Astrauncetacie-Guernica (Spain), Model Constable, cal. 9 mm (.380), Serial No. 1077675.

Agents Frank Grant and Thomas L. Carpenter of the FBI and Chief Deputy Marshal George H. Deakyne were called to testify on behalf of the government. The defendant, his divorced wife, Dr. Robert Beattie, Wayne Allen [3] and Wilbert W. Kee, Correctional Captain at the Delaware Correctional Center, were called to testify on defendant's behalf. From the testimony and evidence presented the Court finds the following facts:

## I. THE FACTS

By a letter dated August 16, 1974, the United States Parole Board requested the assistance of the FBI in locating and apprehending the defendant for parole violation.[4] (Tr. 22). On September 3, 1974, Special Agent Grant received information that the defendant would be at the medical offices of Dr. Roblee Soule in Newark, Delaware. (Tr. 16). Grant knew the defendant because he had arrested him on January 1, 1971 in connection with the forged securities violation for which he had previously been sentenced and later paroled. (Tr. 5). At the time of defendant's arrest in 1971 he had been armed with a loaded .38 caliber revolver. (Tr. 6, 17). Before his apprehension on September 3, 1974 Grant had been informed that the defendant was heavily armed and would not be taken alive. (Tr. 17–18). Grant also had been forwarded in August a 1944 military medical record indicating that Horace E. Hollis, who served in the army between 1939 and 1944, had a psychiatric problem which produced suicidal tendencies.[5] (Tr. 15, 21–22, 23).

Knowing defendant's propensity for carrying firearms and having been warned that he was then armed and would not be taken alive (Tr. 17–18), Grant proceeded to Dr. Soule's office in one automobile accompanied by Deputy Marshals Deakyne and Platzke, (Tr. 16) and in another car were Special Agents Hyden and Howard. (Tr. 17). Just after the federal officers pulled into Dr. Soule's driveway, Grant and the Deputy Marshals approached the defendant who was getting into his automobile. (Tr. 18). When the defendant saw the officers, he started his car, quickly drove across the lawn and through shrubs, paralleling the blocked driveway, to reach the highway in order to make good his escape disregarding the command to stop and the shots fired by the officers. (Tr. 17). Agents Hyden, Howard and Deputy Marshal Platzke in the car which was closest to the highway pursued the defendant on a high-speed chase through several housing developments in Newark. (Tr. 18, 26). During the course of the chase, near Robscott Manor the defendant threw a 9 mm automatic revolver[6] from his car. (Tr. 18). Shortly thereafter the defendant was forced over to the side of the road and arrested at 3:29 P.M. and placed in Hyden's car. (Tr. 18, 26). Immediately thereafter Grant arrived at the scene, the defendant was handcuffed with his hands behind him and placed in the rear seat of Grant's vehicle with Deputy Marshal Platzke. (Tr. 6, 27–28, 31). At 3:36 P.M. Grant furnished the defendant an advice of rights form, which defendant read[7] (Tr. 6) and

---

3. The testimony "given" by Mr. Allen was the result of a stipulation between counsel. (Tr. 154–157).

4. The defendant had been sentenced to four years of imprisonment on October 1, 1971 for the transportation interstate of forged securities and was thereafter paroled on January 9, 1974 and placed on parole supervision in this district. (Tr. 16, 21–23).

5. The medical information apparently referred to another Horace E. Hollis rather

than the defendant who is too young to have served in the military forces at the time stated. (Tr. 23–24).

6. The revolver is the firearm which forms the basis for the present indictment.

7. The defendant may not have been able to read the form because his glasses were chipped and somewhat damaged. (Tr. 29, 96).

which Deputy Marshal Platzke also read aloud to the defendant. (Tr. 6–7, 29–30). At 3:38 P.M. the defendant acknowledged that he understood his rights but he did not sign the advice of rights form. (Tr. 7, 30).

After the defendant acknowledged he understood his rights, Grant asked him questions concerning the 1969 Mustang car that he was driving and made no inquiry about any other matter. (Tr. 7). The defendant was then transported to the Federal Building in Wilmington arriving at the Marshal's office for processing at 4:26 P.M. (Tr. 7–8).

Defendant testified that at the scene of his arrest he was asked by either Marshal Platzke or Deakyne whether he was on drugs and needed anything to straighten him out and that he had answered he was on pills pretty heavy. (Tr. 53–54, 87). However, the defendant was uncertain whether this occurred at the arrest scene or in the Marshal's office or which Deputy Marshal asked the question; he was only sure it was not asked by one of the FBI agents. (Tr. 53–54). In view of the fact that defendant changed his story concerning the conversation except to reiterate the content was between him and one of the Marshals, the Court does not believe that on September 3, 1974 either Deputy Marshal suspected that defendant was in a drug induced state as he now contends.[8]

At 4:56 P.M. the defendant was taken to the FBI office where he was interviewed by Special Agent Grant in the presence of Agents Hyden, Howard and Marshals Deakyne and Platzke. (Tr. 8). The defendant was again advised of his rights, which he stated he understood, and agreed to talk with the agents without an attorney being present. (Tr. 7–8). During the course of defendant's interview with Grant, which lasted an hour and one minute, the defendant stated that he had bought the revolver, which he had thrown from his car during the chase prior to his arrest, for $40 from a black man,[9] he knew only as "Bo," in a pool hall located in either Casey or West Columbia, South Carolina. (Tr. 9). The defendant further admitted that he had test-fired the revolver shortly after it was purchased and found it to be in working order and that he had considered pulling the gun at Dr. Soule's office when he saw the agents approach. (Tr. 9–10).

Agent Grant testified that during the entire interview the defendant was normal in appearance and demeanor, that he was rational in his thinking, was not confused, gave logical, straightforward and willing answers and that his personality and disposition were much the same as they were in January 1971 when Grant spent an entire afternoon with the defendant. (Tr. 11, 18–19, 36–38). At no time during the interview did the defendant state that he was, or had been, using drugs or that he was in a drug induced condition. Indeed, his conduct, reactions and reflexes were so normal as not to suggest such a possibility. Furthermore, neither the searches made of the defendant's person or his automobile, at the time of arrest, nor the later search of his hotel room and luggage turned up any drugs, prescriptions or other paraphernalia which would raise the slightest suspicion that defendant was a drug user. (Tr. 10–11, 171–172).

Upon completion of the interview conducted by Grant on September 3, the de-

---

8. Even if one of the Marshals had asked the question, any inference that he was in a drugged condition at the time is outweighed by defendant's subsequent testimony that rebuts his own characterization of his "drugged" mental state. Moreover, Special Agent Grant, who had known defendant prior to his alleged use of drugs, (Tr. 5–6, 18–19), testified that defendant on the day of his arrest and thereafter appeared no different in manner than he did in 1971. See *infra*.

9. The defendant described "Bo" as a black man, age 40, weight 160 to 170 pounds, six feet in height, brown eyes with a 3 inch scar on the right side of his face. (Tr. 9).

fendant was transported to the Delaware Correctional Center at Smyrna, Delaware by Deputy Marshal Deakyne. (Tr. 12). Because of the contents of the psychological report relating to a Horace E. Hollis, referred to above, Grant advised Deputy Deakyne before he took the defendant to the Correctional Center that the defendant had possible suicidal tendencies. (Tr. 15, 182–183). Deakyne relayed this information to Wilbert W. Kee, a Correctional Captain, who decided to place the defendant, solely for that reason, in the hospital of the Correctional Center. (Tr. 183, 145–146, 149). Captain Kee recalls no conversation regarding drugs upon admitting the defendant to the Correctional Center. (Tr. 148, 151–152).

Thirteen days later on September 16, 1974, Special Agent Grant went to the Correctional Center and interviewed [10] the defendant concerning the defendant's alleged involvement in an armed assault upon an FBI agent in Washington, D. C. (Tr. 12, 35). Towards the end of the interview at the Correctional Center, the defendant for the first time volunteered to Grant that he had been on "reds" and "black beauties" for the past month. (Tr. 12–13, 35).

Hollis took the stand and testified that "black beauty" is the street name for biphetamine-20. that he took orally and "reds" is the street name for seconal, a barbiturate, that he injected with a syringe. (Tr. 44). On direct examination, he testified that by spacing the injection of the two drugs, he was able to maintain a fairly smooth "high" and thus avoid "crashing" which would eventually result from taking only black beauties. (Tr. 45–46).

Dr. Robert Beattie, defendant's expert witness,[11] described biphetamine-20 as a slow-release amphetamine that produces hostility as a consequence of speeding up metabolic rate and seconal as a medium acting depressant that smooths this hostility out. (Tr. 104–107, 108). When ingested in combination and spaced as defendant testified, these drugs would not produce disorientation (Tr. 110, 111, 113, 115) but could produce "a feeling of being very strong, very bright, making . . . super decisions." (Tr. 111).

Hollis claims to have had this feeling at the time of his arrest and when interviewed by the FBI on September 3, that is, that he felt he could "do no wrong" (Tr. 57) and that the episode was "happening to someone else." [12] (Tr. 52). This, the defendant claims, was the drug induced mental state which vitiates any waiver on his part of his constitutional rights.

The entire substance of the defendant's claim is primarily dependent upon the credibility of his testimony because he was not examined by a trained physician near the time of his arrest and interrogation. Defendant contends that his drugged mental state described on September 3 began when he awoke Sunday morning, September 1 in Charleston, South Carolina and injected dedoxyn (Tr. 48, 66), another amphetamine. (Tr. 102). He then went fishing with a group of friends at Santee, South Carolina until late afternoon. (Tr. 68). Everyone was "high" and he kept his high with "black beauties" and "reds" which he had with him. (Tr. 69).[13] Leaving

---

10. Before the interview commenced, defendant was again advised of his rights and he read and signed an advice of rights form. (Tr. 33).

11. Dr. Beattie has practiced internal medicine for a year and had a family practice for 15 years. In addition, he was an assistant medical director for three years in the Methadone Clinic and spent "eighteen months recently" as medical director of Crittenton Rehabilitation, Inc., a contract agency for drug detoxification in Delaware.

(Tr. 98). More generally, he stated that he had been observing patients who were "high" for 3½ years. (Tr. 109).

12. Defendant also testified that everything appeared to proceed very fast at the time of his arrest, (Tr. 57), that since then he has had several "flashbacks" and that on the day of the hearing, he still felt "detached." (Tr. 79, 90, 94–96).

13. Defendant's testimony is unclear whether he consumed these drugs in close sequence,

Santee late Sunday afternoon, defendant testified that he and his group of friends embarked on a round of parties at a number of nightclubs and on the beach at Isle of Palms in the vicinity of Charleston until late Monday afternoon, September 2, when he decided to come to Delaware in an attempt to talk his wife into coming back to South Carolina with him and make a new start on their marriage. (Tr. 67, 70, 76). Defendant claimed he had not slept since Saturday night. (Tr. 70).

Continuing his testimony, Hollis stated he bought a new supply of pills, approximately 8 or 10 black beauties and reds (Tr. 71), and placed them in a prescription bottle labeled biphetamine-20 (the prescription had been issued to him by a South Carolina doctor on July 12, 1974 (DX 1, Tr. 49), and he had continuously refilled it illegally by buying blacks "off the street," (Tr. 49–51)). Upon entering the State of Virginia he removed the syringe for injecting seconal from the suitcase [14] and placed it under the car seat so that he could get to it and throw it out in case he was stopped as it was against the law to possess a syringe in Virginia and on north. (Tr. 71). Defendant "hit up" once in Virginia, arrived in Washington, D. C. on Tuesday, September 3 between 1 and 2 A.M. and went to the Greyhound Bus Station where he became sick attempting to eat. (Tr. 72–73). Defendant then proceeded through Baltimore, arriving at the Marylander Motel on Route 40 between 7 and 7:30 A.M. on September 3 to obtain a room as he was tired from driving. (Tr. 74). He ate at a restaurant next door and about an hour later he obtained a motel room, showered and "laid down for a while," watched television, got restless, got up and dressed and took a black beauty

about 11 A.M. or 12 noon. (Tr. 74–76, 48, 43). Defendant took his final injection of reds between 1:00 or 1:30 P.M., at the Hot Shoppe near Wilmington on I-95 and then threw the syringe away. (Tr. 48, 76, 77). He telephoned his wife from the Hot Shoppe and she told him that Deputy Marshal Platzke wanted to talk to him. (Tr. 76–78).

Defendant acknowledged that his wife had been trying to convince him to surrender to federal authorities and that when he telephoned her he kept the conversation short because he did not know whether her phone was tapped, and hence did not want to give "them" a chance to trace the call. (Tr. 78). Defendant could not reach Deputy Marshal Platzke when he first telephoned from the Hot Shoppe; he finally reached Platzke from another telephone location to which he had gone so that no one would have a chance to trace the first call. (Tr. 78). Defendant told Platzke that he would have to talk to his wife before turning himself in, that he was about ready to give up as he "was tired of running." (Tr. 78).

Hollis rode around some and about 2:00 or 2:30 P.M. he again telephoned his wife and arranged to meet her at Dr. Soule's office at about 3:30 P.M. (Tr. 79). Defendant then checked into the Brandywine-Sheraton Motel, rode around a bit trying to make up his mind whether to meet his wife or "get out." (Tr. 79–80). Hollis, still trying to decide what to do, drove on back roads to Dr. Soule's office where he was surrounded by federal agents. (Tr. 80).

Dr. Beattie hypothesized, upon the facts relating to defendant's drug intake [15] as above related and with his lack of sleep, that defendant would have great difficulty remembering details.

---

but, if he did, this seems to be opposed to usual two hour intervals between oral ingestion of blacks and injection of reds. (Tr. 45–46).

14. The bottle of pills and syringe were in his suitcase in the car trunk. (Tr. 71–72).

15. Dr. Beattie assumed that the defendant had consumed the "highest" number of blacks and reds, that is 12 to 15 of each over the three day period. (Tr. 112). The defendant was far from consistent on the number of pills he took or the number he possessed when he left South Carolina. (Tr. 45, 75, 85–86).

(Tr. 122). The Court is convinced that while the defendant's testimony was contradictory on the important point of the number of blacks and reds that he took during the three day period, had he taken as much drugs as he claimed, combined with his lack of sleep, he would not have remembered as many specific details of his odyssey as he did. More significantly, the motives behind many of his actions—such as removing the syringe from the suitcase and placing it under the car seat for quick disposal if stopped by police, taking precautions in his telephone calls to prevent them being traced, throwing the syringe away in Delaware, driving on back roads to Dr. Soule's office to avoid detection—indicate that he realized he might be captured in Delaware so that his psychological detachment, if any, was minimal. He was very conscious of the potentially incriminatory nature of his actions throughout his journey. Indeed, had the defendant been in a drugged state as he claimed, he would not have "panicked" and driven his car in an effort to avoid capture at speeds of up to 75 mph. (Tr. 17). Dr. Beattie testified that even a person on a "high" from a combination of blacks and reds would not be disoriented as to person, place or time (Tr. 110) and would not necessarily have "no will whatsoever." (Tr. 116).

Furthermore, the defendant admitted that he understood the meaning of the Miranda warnings given to him by the agents upon his arrest and subsequent interrogation because he had heard them often before. (Tr. 97). Finally, the fact that it was not until thirteen days after his arrest and interview that defendant first mentioned the use of drugs to Agent Grant appears to this Court, who heard and saw the defendant testify, to be no more than an afterthought defense.

Accordingly, the Court does not believe the defendant's testimony that he consumed 12 to 15 blacks orally and reds intravenously over the three day period prior to his arrest. But even had he consumed a smaller amount of drugs, the Court concludes that his will was not so over-powered as to make his statements involuntary. This is so because defendant's personality, disposition and demeanor were normal and unchanged at the time of and subsequent to his arrest from 1971; he was not confused, gave logical and willing answers, was not disoriented in person, time or place, at this hearing was able to recall myriad specific details of his journey, failed to mention his drug use until almost two weeks later and appeared on the witness stand as an intelligent person knowledgeable of the technicalities of criminal law.

In reaching this conclusion, the Court has not overlooked the corroborating evidence presented by defendant to show his alleged use of drugs. Defendant introduced into evidence a prescription bottle labeled biphetamine-20 (issued to him by a South Carolina drug store on July 12, 1974) containing two seconal tablets wrapped in aluminum foil, which Mrs. Hollis allegedly found in defendant's suitcase which she had received from the Correctional Center. (DX 1). Mrs. Hollis also testified that in mid-August 1974 she met her husband at the Iron Hill Motel in Newark and observed him take what he called a black beauty from a similar prescription bottle (Tr. 125–126) and that on numerous occasions after their separation in July 1974 defendant had told her that he was on drugs. (Tr. 127). The Court does not believe that Mrs. Hollis found the prescription bottle introduced into evidence as DX 1 in defendant's suitcase after she retrieved it from the Correctional Center. The suitcase was originally seized by Special Agent Carpenter from the Brandywine-Sheraton Motel on September 4, 1974 (Tr. 163–169), he inventoried its contents, and his effort was double-checked by Agent Grant. (Tr. 171, 174, PX 2). Later the contents of the suitcase were inventoried by Deputy Marshal Platzke. (Tr. 184, DX 3). Finally, the contents of the suitcase were inventoried by personnel at the Correctional Center. (Tr. 149–150). None of

the four thorough searches conducted by experienced officers disclosed the prescription bottle and the Court does not believe Mrs. Hollis found the bottle in the suitcase as she testified.

Furthermore, even if the Court were inclined to accept as the truth that Mrs. Hollis did find the bottle in the suitcase and that she had observed the defendant take a pill at the Iron Hill Motel in August 1974, all that evidence would establish is that defendant had some pills in his possession when he came to Delaware in mid-August and September 3 and that he was familiar with the properties of seconal when he advised his wife to use one for her nervous condition. (Tr. 132).

## II. THE LAW

■ The government has the burden of proving by a preponderance of the evidence that the defendant's statements made to the federal officers were voluntary. Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The Third Circuit recognized in United States v. Dutkiewicz, 431 F.2d 969 (C.A. 3, 1970) that this burden is a heavy one especially where the defendant waives his right to the presence of an attorney at his interrogation. Miranda v. Arizona, 384 U.S. 436, 475–479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), cited in Schneckloth v. Bustamonte, 412 U.S. 218, 240, 93 S.Ct. 2041, 36 L.Ed. 2d 854 (1973). Defendant must have knowingly and intelligently waived his rights.

■ The trial court thus is required to decide from the totality of the circumstances, Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), whether a defendant's statement was the product of an *essentially free* and unconstrained choice. United States v. Arcediano, 371 F.Supp. 457,

467 (D.N.J.1974). That is, the Court must determine whether governing self-direction of the defendant has been critically impaired by his drug induced state of mind. There is no *per se* rule mandating that statements made under the influence of narcotics are involuntary. Nor are they presumptively involuntary or likely to be so. Compare Collins v. Brierly, 492 F.2d 735, 742 (C.A. 3, 1974) (Judge Adams dissenting) and United States v. Harden, 480 F.2d 649, 651 (C.A. 8, 1973). Nevertheless, the Court must carefully sift the evidence in spite of the fact that the defendant's waiver may have blown his case because of "internally generated guilt, fear, stupidity or drunkenness" or drug lethargy. See United States v. Bernett, 495 F.2d 943, 965 (C.A.D.C.1974) (concurring opinion of Judges Wilkey and Jameson). This includes particular focus "upon a . . . defendant's demeanor, coherence, articulateness, his capacity to make full use of his faculties, his memory, and his overall intelligence." *Arcediano*, 371 F.Supp. at 466. See United States v. Leland, 376 F.Supp. 1193, 1199 (D.Del. 1974).

■ This Court having considered the totality of the evidence and focused on the relevant factors, concludes, first, that defendant's testimony as to the quantity of drugs he consumed over the three day period is incredible, and second, even though he may have consumed some drugs, he retained governing self-direction before and after his arrest so that his will was not "critically impaired" when he waived his rights and made the statements in question to the federal officers. Thus, defendant's motion to suppress will be denied.

## ORDER

For the foregoing reasons, defendant's motion to suppress is hereby denied.