**UNITED STATES of America,
Plaintiff,**

v.

**Vicky Lee PRINCE, Defendant.**

**No. CR. A. 00–47–GMS.**

United States District Court,
D. Delaware.

July 31, 2001.

Keith M. Rosen, Assistant United States Attorney, Wilmington, Delaware, for Plaintiff.

Charles E. Whitehurst, Jr., Young, Malmberg, Whitehurst & Curley, P.A., Dover, Delaware, for Defendant.

## *MEMORANDUM OPINION*

SLEET, District Judge.

### I. INTRODUCTION

On May 23, 2000, Vicky Lee Prince was indicted for being an accessory after the fact to a robbery, *see* 18 U.S.C.A § 3, committing misprision of a felony, *see* 18 U.S.C.A. § 4, and transporting money of the value of $5,000 or more in interstate commerce, *see* 18 U.S.C.A. §§ 2, 2314. These charges arose out of the robbery of the PNC Bank, in Bear, Delaware on January 14, 2000. About a month after this robbery, Prince and her boyfriend, John Walter Trala ("Trala"), were stopped for a series of routine traffic violations. As a result of the traffic stop, Prince was taken into custody by police officers in Morehead City, North Carolina. At the scene of the stop and after she was taken into custody, members of the Morehead City Police Department took statements from Prince. On July 19, 2000, Prince filed a motion to suppress these statements. See Fed. R.Crim.P. 12(b)(3). After considering the evidence introduced at the suppression hearing and the arguments of the parties, the court concludes that the statements Prince seeks to suppress are admissible.

For the reasons that follow, Prince's motion to suppress will be denied.

## II. FINDINGS OF FACT

On November 8, 2000, the court held an evidentiary hearing to resolve Prince's motion to suppress. At the hearing, the government called Sergeant Philicia Long–Fowle ("Sgt.Long–Fowle") and Captain Kenneth Long ("Capt.Long") of the Morehead City Police; Agent Donald Maynard of the FBI and Agent Dominic A. Desderio of the FBI. Prince did not testify. Nor did she call any witnesses on her behalf. Based on the evidence presented at the suppression hearing, the court makes the following findings of fact. *See* Fed. R.Crim.P. 12(e).

On the morning of February 10, 2000, Officer Timothy Guthrie of the Morehead City (North Carolina) Police Department ("MCPD") stopped a white Ford Taurus for traffic violations.[1] The Taurus was occupied by a male driver, a female passenger, and an infant in the back seat. Vicky Lee Prince was the female passenger in the car.

Shortly after 10:00 a.m. on that same morning, Sgt. Long–Fowle of the MCPD was on routine patrol. At that time, Sgt. Long–Fowle responded to a call to South 33rd and Arendell streets, Morehead City, North Carolina. Upon arriving at the scene, Officer Guthrie briefed Sgt. Long–Fowle on what had transpired. Specifically, Officer Guthrie informed Sgt. Long–Fowle that he had spoken to the driver of the vehicle, and that the driver had provided a name and date of birth, but the driver had no license on him. The driver had given the name of "Matt Allen, Jr.," however, he had a provided a registration for the Taurus, which named "Vicki Prince" as the owner of the vehicle.

Sgt. Long–Fowle then approached the driver, and asked for identification. She also asked him if there was anything illegal in the car. The driver replied no. He did indicate that there was approximately $10,000 in cash in the car. Sgt. Long–Fowle then asked the driver if the officers could search the vehicle. The driver consented.

Sgt. Long–Fowle then approached the passenger side of the Taurus and asked the passenger to step out of the vehicle. After the passenger stepped out of the vehicle, Sgt. Long–Fowle had a brief conversation with her. During the conversation, Sgt. Long–Fowle asked the passenger for her name. The passenger, replied "Michelle Trala." Sgt. Long–Fowle identified this passenger in court as the defendant, Vicky Prince. Also during this conversation, Sgt. Long–Fowle asked "where they were going, how long they had been there, her name, et cetera." In response, the passenger stated that she and the driver were moving to North Carolina, that the driver was planning to open a tattoo parlor, and that they were staying in a hotel. The passenger added that they had just arrived a few days earlier, and that her daughter had recently started school. In addition, the passenger identified the baby in the back seat as hers and the driver's.

Sgt. Long–Fowle then asked the passenger if there was anything illegal in the car, and she replied that there was not. Sgt. Long–Fowle then asked if there was anything unusual in the car. Again, the passenger replied no. Sgt. Long–Fowle then stated that, "your companion said that there was about $10,000 or a large amount of cash in the car." The passenger re-

---

1. The legality of the stop has already been determined by the court. *See United States v. Trala,* C.A. 00–23–GMS, D.I. 63, (D.Del. Jul. 7, 2000) (unpublished) (denying the defendant's motion to suppress).

sponded, "Oh yeah, that's true." Sgt. Long–Fowle then asked where the cash came from and the passenger stated that she and the driver had been "working and saving, working and saving." Sgt. Long–Fowle then asked the passenger for permission to search the car. She consented.

Sgt. Long–Fowle then asked the passenger her date of birth. She was quite hesitant. In Sgt. Long–Fowle's opinion, the passenger was being dishonest, and thus, Sgt. Long–Fowle advised her that she did not believe that she was being truthful about her identify. Sgt. Long–Fowle stated that she believed that the passenger was "Vicky Prince." The passenger denied this, and stated that "Vicky Prince" was her sister-in-law, and that "Vicky" had purchased the car for her and the driver.

Sgt. Long–Fowle then asked if the passenger had any identification in her purse. She replied that she did not. Sgt. Long–Fowle then asked to examine the contents of the purse. The passenger answered "That's fine." Then she equivocated some. Sgt. Long–Fowle sat the purse on the trunk of the car. The passenger then said, "I might as well tell you my name is really Vicky Prince."

Once the passenger identified herself as Vicky Prince, they both went through her purse and found hotel receipts from numerous North Carolina hotels in the name of "Kevin Trala." Prince identified Kevin Trala as a cousin who had come to stay with them, but had already left town.[2] Sgt. Long–Fowle also discovered what appeared to be a benefits card bearing the name of two children. The baby's last name was listed on the card as "Trala."

Sgt. Long–Fowle then placed Prince in handcuffs and seated her in a police car.

Sgt. Long–Fowle explained to Prince that she was being placed in handcuffs for officer safety, and that she was not under arrest. Sgt. Long–Fowle believed that there was a safety concern in light of fact that she was walking back and forth between the driver and Prince, who were situated in different cars, and that they had been providing her with inconsistent stories. Although Sgt. Long–Fowle did conduct a pat-down search of Prince, she was still concerned that Prince could pose a safety threat by being able to jump her from behind, or that she could escape with the car.

At the time Prince was placed in handcuffs, three other MCPD officers were on the scene. Officer Guthrie was occupied with the driver, and was seated with him inside a police car. The other two officers were busy searching the Ford Taurus. At some point thereafter a fifth officer, Major Johnson, arrived on the scene. However, she was occupied attending to Prince's baby. Thus, no other officers were watching or positioned right beside Prince while Sgt. Long–Fowle walked back and forth between Prince and the driver.

The handcuffs did not remain on Prince throughout the traffic stop. At some point, Prince asked to see her baby. Sgt. Long–Fowle agreed, removed the handcuffs, and took Prince to the Ford Taurus to see the child. While checking on her baby, Prince became irate and upset. As a result, Major Johnson directed Sgt. Long–Fowle to put the handcuffs back on her and have her sit down.

While Prince was seated in the car, Sgt. Long–Fowle again asked about the source of the money in the Taurus. Prince first

---

**2.** When asked about Kevin Trala, the driver of the car initially stated, "I don't know who you are talking about." When Sgt. Long–Fowle explained that Prince identified this Kevin Trala as family, the driver then responded, "Oh yeah. He is my kinfolk, he hasn't made it here yet."

responded that the driver had won the money at the races in Delaware. Sgt. Long–Fowle confronted Prince with the fact that race tracks keep records of payouts. In response to this information, Prince became aggravated and stated that the driver had actually won the money at the slot machines.

The driver of the car advised the officers that Prince may have active warrants. The MCPD officers called in this information in order to gain confirmation. Once they received confirmation that Prince did in fact have outstanding warrants, she was placed under arrest pursuant to those warrants. Specifically, Prince was advised that she was under arrest for outstanding warrants against her, which had been confirmed in Hartnett County [North Carolina]. Sgt. Long–Fowle cannot recall whether she advised Prince of her Miranda rights at the time she was placed under arrest.

After Prince was placed under arrest, a North Carolina Department of Social Services case worker arrived on the scene and attempted to speak with Prince about locating a family member to care for the children. Prince initially did not want to provide this information, but ultimately did so. She was then transported to the MCPD police station.

Once at the police station. Sgt. Long–Fowle contacted Prince's probation officer. Sgt. Long–Fowle simultaneously began processing the defendant and asking routine booking questions, such as the defendant's name, address, etc. When the probation officer suggested that the driver might be "John Walter Trala, Jr.," Sgt. Long–Fowle wrote that name on a slip of paper and placed it in front of Prince. Prince acknowledged that was the driver's name, and stated that they had tried to

conceal his identity because he did not have a driver's license.

According to Sgt. Long–Fowle, Prince appeared to be "lackadaisical" during the course of their interaction. Specifically, Sgt. Long–Fowle noted that Prince had slow, monotone speech and an unkempt appearance. The Sergeant surmised that she may have been coming down from a drug high, or crashing. Prince never complained that she was in fact crashing, under the influence of drugs, or that she had not slept in a long while. She appeared to be able to understand the questions posed by Sgt. Long–Fowle, and gave responsive answers to those questions.

Sgt. Long–Fowle never threatened or promised anything to Prince in return for speaking to her. In particular, Sgt. Long–Fowle never threatened to take Prince's children away from her, or subject her to imprisonment, if she did not cooperate.

Later in the day on February 10, 2000, at approximately 1:15 p.m., Prince was interviewed at the Morehead City police station by MCPD, Captain Kenneth Long. At the outset of the interview, Capt. Long advised Prince of her Miranda rights, explained to her what he knew of her situation, and asked for her cooperation. Prince indicated that she wished to waive those rights and speak with Capt. Long.

During the interview, Prince essentially described her relationship with the driver, whom she called "A.J." [3] In particular, she stated that she lived with A.J., whom she claimed was a concrete worker and carpet layer. She had known him for two to three years, and they were planning to move to North Carolina. She also explained that she and A.J. had gone to Delaware Park where A.J. frequently goes

---

**3.** A.J. was the fictitious name that the driver of the Ford Taurus had initially provided to MCPD officers. They ultimately learned that his name was John Walter Trala.

to gamble. According to Prince, A.J. had won several thousand dollars, and she did not know if he had filed any tax forms. Prince also stated that her children were ages six months and thirteen years old.

The interview lasted approximately 20 minutes. At no point during the interview did Prince state that she would not answer any questions or refuse to speak to Capt. Long. At no point did she ask to speak to a lawyer. Capt. Long made no promises or threats in order to induce Prince to speak with him. Capt. Long also advised Prince that it was his understanding that the FBI had no intentions of charging her; they were simply trying to get to the truth of the matter concerning Trala. According to Capt. Long, Prince was alert and oriented, but somewhat fatigued and emotionally upset during the interview. In Capt. Long's opinion, Prince did not appear to be suffering from drug use or withdrawal from drugs. He also thought she understood his questions, and gave lucid, responsive answers. At no point in time during the interview did Prince state that she was overly fatigued, had not slept in a while, or that she was suffering from effects of drug use or withdrawal. After the interview, Prince was turned over to Sgt. Long–Fowle, who transported her to Carteret County jail. At that time, Prince was taken before a Magistrate Judge, and was then incarcerated. Jailhouse records show that Prince was brought into the jail at 2:23 p.m. on February 10, 2000.

Later that day, after speaking with FBI agents in Delaware, Capt. Long had Prince brought back to the police station for further questioning. Prince's second interview with Capt. Long began at approximately 8:39 p.m. Prior to asking Prince any questions, Capt. Long read-vised her of her Miranda rights. Prince again verbally indicated that she was willing to speak with him. Also, before ques-tioning her, Capt. Long asked if she need-ed an attorney present. He emphasized that the decision to have counsel present was up to Prince. He then left the inter-view room for a period of time in an effort to allow Prince to consider her situation. At no time during the second interview did Prince state that she wished to speak to an attorney, nor did she state that she did not want to speak to the officers.

During this interview, Capt. Long ad-vised Prince that the FBI was investigat-ing the robbery of a PNC Bank in Dela-ware, that they believed that an employee of the bank was involved, that they be-lieved the driver was involved, but that they did not believe that Prince had any involvement. Capt. Long also advised Prince that he believed that she was jeop-ardizing herself by not cooperating, and that he did not believe that she was being truthful. Capt. Long again stated that the FBI was unlikely to charge her at that time. However, he did state that she was facing possible prosecution if she did not cooperate, and that he would relay her cooperation to the FBI. Capt. Long also informed Prince that her children had been turned over to DSS and explained that in situations like this, her children were most important. Capt. Long noted that Prince was also facing a probation violation, which could also result in a possi-ble jail sentence and which could also af-fect her children.

Prince provided information regarding the robbery of the bank in Delaware. Specifically, she stated that she and the driver, whom she now identified as "Son-ny," were friends with Melissa and Phillip Bailey who lived across the street from them. Melissa worked at the PNC Bank that had been robbed. Phillip was addict-ed to cocaine. Regarding the robbery, Prince stated that Melissa had been "bug-ging" Sonny about assisting with the rob-

bery, and had told them around Christmas time that she had already stolen money from the bank in order to support Phillip's drug habit. According to Prince, both she and Sonny explained that they did not want to take part in a robbery, however, there was continued conversation with Melissa about the robbery. The day of the robbery, Sonny showed up at their motel and showed her a handful of money. Later that day, she and Sonny left to travel to Virginia and then onto North Carolina.

According to Capt. Long, although Prince was fatigued and emotional, she was still lucid and responsive during this second interview. At no point did Prince state that she was too tired to talk or that she had not slept in a while. She also never stated that she was suffering from the effects of drug use or withdrawal. Again, Capt. Long made no promises or threats to Prince during the second interview to induce her to speak with him.

The interview lasted until approximately 11:00 p.m. Afterwards, Prince was returned to the county jail.

## III. DISCUSSION

In her motion to suppress, Prince argues that statements made after Sgt.

Long–Fowle placed her in handcuffs should be suppressed because she was in custody at that point, but had not been advised of her Miranda rights. Prince also argues that her statements to Capt. Long were made involuntarily and coerced from her in violation of her constitutional rights.[4]

### A. Statements Made to Sgt. Long–Fowle

Prince contests that admissibility of statements made to Sgt. Long–Fowle after she had been placed in handcuffs because she was not advised of her Miranda rights. Specifically, Prince contends that the statements she made indicating that the money was won at the race track, any contact information given to DSS or Sgt. Long–Fowle, her response to the piece of paper with Trala's name on it and her comment that Trala did not give his name because he did not have a license should be suppressed.[5] In contrast, the government argues that Prince was not in custody before she was placed under arrest, and thus, her Miranda rights did not attach.

Miranda warnings[6] are required only when a suspect is subject to custodial

---

4. Prince also moved to suppress statements made to FBI agents. However, those issues are no longer before the court, and thus, will not be addressed.

5. The Government concedes that Prince was in custody at the police station. Thus, the statements made at the station concerning Trala's identity will not be offered in the government's case-in-chief. Thus, the court will only address the admissibility of statements made at the side of the road, before Prince was formally placed under arrest and taken to the police station. The court does note, however, that routine booking questions are not considered interrogation and, therefore, do not require Miranda warnings. *See Pennsylvania v. Muniz*, 496 U.S. 582, 600–02, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (explain-

ing that routine questions are not interrogation because they are not designed to elicit incriminating responses).

6. *Miranda* warning include certain rights of which an accused must be informed, and must waive, before interrogation can commence:

He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.

interrogation. *See Miranda v. Arizona,* 384 U.S. 436, 477–78, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Statements made as a result of a custodial interrogation are not admissible unless the defendant has been advised of, and has validly waived, her Miranda rights. *See Miranda v. Arizona,* 384 U.S. 436, 477–78, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, a defendant's Miranda rights only attach if the statement at issue occurred when the defendant was "in custody," and was the product of the "interrogation." *See Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990).

■ In this case, in the absence of Miranda warnings, the government has the burden of establishing by a preponderance of the evidence that Prince's statements were not the product of custodial interrogation. *See United States v. DeSumma,* 44 F.Supp.2d 700, 703 (E.D.Pa.1999); *United States v. Briscoe,* 69 F.Supp.2d 738, 740 (D.V.I.1999).

■ Whether a person is in custody is determined through an examination of the objective circumstances. *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). In making this decision, the court must consider the totality of the circumstances. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). The "ultimate inquiry [being] whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." *Beheler,* 463 U.S. at 1125, 103 S.Ct. 3517; *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

In support of her motion to suppress, Prince argues that although Sgt. Long–

Fowle explained to her that she was not under arrest, Prince was not free to leave because "once a person is handcuffed any reasonable person would view [herself] as being under arrest." Moreover, Prince argues that when Sgt. Long–Fowle placed her in the police car, she further significantly interfered with her liberty, thereby, creating a custodial situation. In light of the circumstances surrounding the traffic stop, the court finds Prince's arguments to be without merit.

First, as the government points out, the fact that a suspect may not be free to leave the scene of an investigative stop "does not mark the point where the stop escalates into an arrest, since in neither a stop nor an arrest is a suspect free to leave." *United States v. Edwards,* 53 F.3d 616, 619 (3d Cir.1995). The court is mindful that it must examine the totality of the circumstances in making a determination as to whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

■■ In the context of an investigative stop, de minimus intrusions on the liberty of a person are allowed in order to advance officer safety. *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). While the court recognizes that the use of force, such as handcuffs and firearms, constitutes a greater level of intrusion—when the circumstances reasonably warrant such measures, the use of firearms, handcuffs, and other forceful techniques does not necessarily transform an investigative detention into a full custodial arrest. *See Terry,* 392 U.S. at 27, 88 S.Ct. 1868 ("[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others

*Alston v. Redman,* 34 F.3d 1237, 1242 (3d Cir.1994) (quoting *Miranda,* 384 U.S. at 479, 86 S.Ct. 1602).

was in danger."); *See also Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.") (quoting *Terry v. Ohio,* at 23, 88 S.Ct. 1868.).

 In this case, Prince claims that she was in custody because she was placed in handcuffs and kept in a police car. However, there is no per se rule that the use of handcuffs or placement in a police car during a traffic stop constitutes an arrest. *See Baker v. Monroe Township,* 50 F.3d 1186, 1193 (3d Cir.1995); *United States v. Padilla,* Crim. Nos. 96–606–03, 96–606–04, 1997 WL 158396, at *7–8 (E.D.Pa. Mar.31, 1997); *United States v. Dover,* No Crim. A. 96–181, 1996 WL 683921, at *4 (E.D.Pa. Nov.26, 1996). If a suspect is shown to be armed and dangerous, or resists or attempts to escape, or otherwise acts suspiciously, then more intrusive or forceful measures may be warranted without turning the detention into an arrest. *See Baker,* 50 F.3d at 1193; *Vasquez v. Salisbury Township Police Dep't,* No. Civ. A. 98–2655, 1999 WL 636662 (E.D.Pa.1999).

 This is such a case where more intrusive factors were needed. Under the totality of the circumstances, the court concludes that Sgt. Long–Fowle was justified in her concerns about officer safety— Prince could have attacked her from behind. Moreover, under the circumstances, it would also have been reasonable to be concerned that Prince might attempt to escape. Although Sgt. Long–Fowle had patted Prince down for weapons, the Sergeant was continually walking back and forth between vehicles and other officers on the scene were occupied. Most important, Prince had already acted suspiciously. She was emotional and upset, and had given conflicting stories. Taken together,

all of this could reasonably lead an officer to be cautious. In fact, the court notes Prince was told that she was not under arrest and was simply being handcuffed for safety reasons. Moreover, Sgt. Long–Fowle readily agreed to remove the handcuffs in order to allow Prince to check on her baby upon her request. In that instance, both Sgt. Long–Fowle and Major Johnson were able to monitor Prince, and thus, the need for concern about safety was mitigated.

In light of the facts of this case, the court holds that the use of handcuffs and the placing of Prince in the police car were reasonably necessary to assure officer safety and maintain the status quo during the course of the stop. *See United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). Therefore, Prince was not in custody within the meaning of *Miranda* when she made statements about the source of the money. Prince's motion to suppress statements made to Sgt. Long–Fowle at the roadside before she was formally placed under arrest will, therefore, be denied.

**B. Statements Made to Captain Long**

Next, Prince argues that her statements to Capt. Long. should be suppressed because they were involuntary and coerced. "Only if there is a voluntary, knowing, and intelligent waiver of the rights expressed in the warnings can police question a suspect without counsel being present and introduce at trial any statements made during the interrogation." *Alston v. Redman,* 34 F.3d at 1242. In this case, it is not disputed that Capt. Long advised Prince of her Miranda rights, and that she waived those rights, before both interviews on February 10, 2000. However, Prince maintains that her statements were involuntary because: 1) she was suffering from the effects of sleep deprivation and drug

use; 2) Capt. Long deliberately made references to her children to cause her to fear losing them; and 3) Capt. Long stated on numerous occasions that she would not be prosecuted. The court will address these issues in turn.

### 1. Affects of Sleep Deprivation and Drug Use

■■■■ Although the court finds that there is sufficient evidence to show that Prince may have been fatigued and suffering the effects of recent drug use (or was crashing, that is coming down from using drugs), there is insufficient evidence to show that Prince was so affected by fatigue or drug use that her statements were involuntary. The mere fact that one has taken drugs does not render consent involuntary. *See United States v. Hollis*, 387 F.Supp. 213, 220 (D.Del.1975) ("There is no per se rule mandating that statements made under the influence of narcotics are involuntary."); *see also United States v. Gipp*, 147 F.3d 680, 686 (8th Cir.1998). In each case, the trial court must decide under the totality of the circumstances whether a statement was the product of an essentially free and unconstrained choice. *See United States v. Hollis*, 387 F.Supp. at 220 (citations omitted). The question is one of mental awareness so that the act of consent was the consensual act of one who knew what he or she was doing and had a reasonable appreciation of the nature and significance of his or her actions. *See United States v. Gipp*, 147 F.3d at 686. In particular, the court should focus "upon a . . . defendant's demeanor, coherence, articulateness, his capacity to make full use of his faculties, his memory, and his overall intelligence." *United States v. Hollis*, 387 F.Supp. at 220 (citations omitted).

■■■ Although there is evidence in the record which suggests that Prince was disheveled, tired, and emotional,[7] there is insufficient evidence from which the court could conclude that statements made by Prince were not consensual, or that she did not understand the significance of her actions. For example, although Sgt. Long–Fowle and Capt. Long stated that Prince looked tired and unkempt, they both stated that she was coherent and was able to understand and respond to their questions. In addition, there is evidence in the record which demonstrates that Prince was mentally aware and had a reasonable appreciation of the nature and significance of her actions. For example, she repeatedly demonstrated concern for her children. Also, in realizing that she would be caught in a lie, she began to tell the truth.

Finally, there is no indication that Prince ever told Capt. Long that she was sleep-deprived or suffering from withdrawal. Moreover, there is no evidence in the record which would indicate that Capt. Long knew or suspected that Prince was suffering from withdrawal or sleep deprivation. The court notes that Capt. Long, a sixteen year veteran officer, had considerable experience with narcotics users.

Although Prince may have indeed been fatigued and disheveled, the court finds that she was lucid and thus, capable of making informed decisions. As a result, under the totality of the circumstances, the court cannot conclude that Prince was suffering from a mental impairment that in turn caused her will to be overborne. *See United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir.1990).

### 2. Threats of Loss of Her Children and Life Imprisonment

■■■ Next, Prince alleges that Capt. Long threatened her with the loss of her

---

7. Sgt. Long–Fowle suspected that Prince was suffering the after-effects of drug use. Capt. Long testified that he did not suspect that Prince was suffering from withdrawal.

children if she did not cooperate. A statement is given voluntarily if, under the totality of the circumstances,[8] it is the product of an essentially free and unconstrained choice by its maker. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see also United States v. Swint,* 15 F.3d 286, 289 (3d Cir.1994); *United States v. Velasquez,* 885 F.2d 1076, 1087 (3d Cir. 1989) (explaining that a statement is voluntary when it is "the product of free and deliberate choice rather than intimidation, coercion or deception."). Thus, if the person's will is overborne or his capacity for self-determination is critically impaired, the statement will be considered involuntary. *See Schneckloth,* at 226–27, 93 S.Ct. 2041. The government has the burden of proving, by a preponderance of the evidence, that a statement was made voluntarily. *See Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

■■■■■ A statement must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however, slight, nor by the exertion of improper influence. *See United States v. Tingle,* 658 F.2d 1332, 1335 (9th Cir.1981); *see also Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976); *United States v. Fraction,* 795 F.2d 12, 14 (3d Cir.1986). Express threats that a defendant's children will be taken away or that a defendant faces a long prison sentence if she fails to cooperate have been held to be so coercive that the defendant's statements were rendered involuntary. *See Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). Even if threats of this type are more subtle

rather than direct, but have the same "purpose and effect" as express threats, a defendant's statements are not voluntary. *See United States v. Tingle,* 658 F.2d at 1337. In other words, when the purpose and objective of an interrogation is to cause a defendant to fear that failure to cooperate will result in loss of her children, any statements made in the course of the interrogation will be considered to be coerced and involuntary. *See id.* at 1336.

■■■■ In this case, there is no evidence in the record of express threats that Prince would lose her children or face a long prison term for failing to cooperate. The record does indicate, however, that Prince was told, in essence, that her children should be her primary concern. After considering the totality of the circumstances, the court concludes that Prince's statements were not the product of coercion. First, this case is easily distinguishable from *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). In that case, the interrogating officers expressly threatened to take the suspect's children from her if she did not cooperate. *See* 372 U.S. at 534, 83 S.Ct. 917. Moreover, this case is also distinguishable from *United States v. Tingle,* 658 F.2d 1332 (9th Cir.1981), because in that case, it was clear that the purpose of interrogation was to intimidate and coerce the defendant. *See* 658 F.2d at 1336.

Although Capt. Long mentioned Prince's children, there is no evidence that he used this information for the purpose of intimidating and coercing Prince. Capt. Long explained to Prince that her children had

---

**8.** In assessing the totality of the circumstances, the court may look at the following factors: 1) the youth of the accused; 2) his lack of education; 3) his level of intelligence; 4) the lack of any advice to the accused of his constitutional rights; 5) the length of detention; 6) the repeated and prolonged nature of the questioning; 7) the use of physical punishment such as the deprivation of food or sleep. *Schneckloth v. Bustamonte,* 412 U.S. at 226, 93 S.Ct. 2041 (citations omitted).

already been turned over to DSS. He explained that in a situation like this, her children should be most important to her. Capt. Long also explained that Prince was facing a probation violation, which could also result in a possible jail sentence and affect her children. The record clearly demonstrates that Prince was very concerned about the whereabouts and welfare of her infant daughter because DSS had been called to the scene. Under the circumstances, it was not unreasonable for those concerns to be addressed at the scene and at the station. *But see Tingle,* 658 F.2d at 1337 (explaining that the officer had no legitimate reason for telling the defendant that she would not see her child). *See also United States v. Kolodziej,* 706 F.2d 590, 594–95 (5th Cir.1983) (explaining that it was not coercion for officer to point out that if defendant and her husband where taken into custody, her child could be in the custody of a state welfare agency).

In addition, Prince was merely advised that her children should be her first concern. There is no evidence in the record which would suggest that Prince was told that her cooperation would have a significant impact on her right to see her children. *But see id.* (finding coercion where police officer, in soliciting a confession, recited a virtual litany of maximum penalties that the defendant would face and told her that she would not see her children for a while). Also, Capt. Long did not threaten to inform federal or state prosecutors if Prince did not cooperate. *But see id.* (finding coercion because officer threaten to use the defendant's failure to cooperate

against her). Finally, although there is evidence in the record which shows that Prince was fatigued and emotional at times, there is no evidence in the record which would establish that her will was overborne. *But see id.* (finding that the record reflected sufficient evidence showing that the defendant felt great psychological stress).[9]

Under the totality of the circumstances, the court concludes that Capt. Long's references to Prince's children did not constitute undue pressure or coercion such that Prince's will was overborne. *See United States v. Kolodziej,* 706 F.2d at 594 (5th Cir.1983) (rejecting defendant's claim that statements were involuntary where police merely advised suspect of possible incarceration and loss of custody of child, but there was no evidence that the defendant's will was overborne).

3. Alleged Promises Not to Prosecute

 Prince also states that Long "told her on numerous occasions that she would not be prosecuted," and that these promises constituted coercion. Although it is true that a statement must not be obtained by any direct or indirect promises, *United States v. Fraction,* 795 F.2d at 14, the fact "that a law enforcement officer promises something to a person suspected of a crime in exchange for the person's speaking about the crime does not automatically render inadmissible any statement obtained as a result of that promise." *United States v. Walton,* 10 F.3d 1024, 1028 (3d Cir.1993). Thus, the voluntariness of a statement does not depend solely upon whether it was made in response to

**9.** Moreover, it is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect. *See Miller v. Fenton,* 796 F.2d 598, 605 (3d Cir.1986), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). For example, an interrogator may play on the suspect's sympathies or explain that honesty might be the best policy for a criminal who hopes for leniency. *See id.* "These ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *Id.*

promises, rather, the court must determine voluntariness by judging the totality of the circumstances. *See id.* As the government correctly asserts, the key inquiry is whether the alleged promise actually induced the statement that the defendant seeks to suppress. *See id.*

■ In this case, the record shows that Capt. Long stated that: 1) the FBI did not believe that Prince had been involved in the bank robbery; 2) he believed that she was jeopardizing herself by not cooperating and being untruthful; 3) he believed that the FBI had no intention of charging her at that time, but that they wanted her to be truthful; 4) he believed that she was facing possible prosecution if she did not cooperate; and 5) he would relay her cooperation to the FBI and tell them that she was cooperating, if she decided to do so.

■ Upon consideration of these comments, the court concludes that they do not constitute promises. Rather, Capt. Long's statements merely stated his understanding of the situation that Prince faced. Thus, as a factual matter, Capt. Long never promised Prince that she would not be prosecuted. Even giving Prince the benefit of the doubt, one statement made by Capt. Long could be construed as a promise in that he stated that he would advise the FBI of Prince's cooperation, if she chose to do so.[10] The court, however, will not construe this statement as a promise which was used to induce Prince's statements. A promise to bring cooperation to the attention of the authorities does not render a statement involuntary. *Alston v. Redman*, 34 F.3d at 1254 (finding that a promise to make a non-

binding recommendation to the prosecutor, did not support finding that defendant's waiver of his Miranda rights was coerced); *United States v. Fraction*, 795 F.2d at 14–15 (collecting cases).

## IV. CONCLUSION

Upon review of the evidence introduced at the suppression hearing and the arguments of the parties, the court finds that the statements Prince made at the side of the road before she was formally arrested are admissible because she was not subjected to custodial interrogation. The court also finds that, under the totality of the circumstances, Prince's statements to Capt. Long were made voluntarily. Specifically, the record shows that Prince's will was not overborne because of sleep deprivation or the effects of withdrawal. Moreover, there is no evidence to support Prince's claims that her statements were coerced because of threats that she would lose her children or because of promise made to her. For these reasons, her motion to suppress will be denied. The court will issue an order to this effect in conjunction with this opinion.

---

10. This statement is not a promise, but rather, a prediction that the FBI would likely not prosecute Prince. *See United States v. Fraction*, 795 F.2d at 14–15 (explaining that a similar statement was not a promise in the sense that it did not "offer to perform or withhold some future action within the control of the promisor, in circumstances where the resulting action or inaction will have an impact upon the promisee.")