**George William MILTON, Petitioner,**

v.

**Louie L. WAINWRIGHT, Director, Division of Corrections, State of Florida, Respondent.**

**No. 69–705–Civ–CF.**

United States District Court
S.D. Florida.

Nov. 6, 1969.

---

Bruce E. Lazar, of Dubbin, Schiff, Berkman & Dubbin, Miami, Fla., for petitioner, George William Milton.

Jesse J. McCrary, Jr., Asst. Atty. Gen., Miami, Fla., for respondent, Louie L. Wainwright.

FULTON, Chief Judge.

Beginning in June of 1957 George William Milton told friends he was going with a girl named Minnie Lee Claybon who had a steady job and gave him money. He didn't like her, he said, because she was ugly, and he'd rather not be seen on the streets with her, but he liked her money. George was a boxer. He was going to be a champion, he said, another Joe Louis. He had the build for it, at 6 feet 2 inches, and 185 pounds. All he needed was Minnie's money so he could buy equipment and finish training. In March of 1958 George and Minnie rented an apartment together in Miami. George asked the landlord if he knew of a good insurance company. During March and April of that year George took out three life insurance policies on Minnie, with a combined value of $8,500, payable in the event of accidental death. George didn't have much money. In fact at one point he had to hock some clothes for $2.00, but he kept those insurance premiums paid. During those same two months George repeatedly contacted his girlfriend, Lucille Williams, telling her he would soon be coming into a lot of money and would meet her in New York, where they would be married.

Late in the afternoon of May 31, 1958, George bought a cheap, eight-year old car. The back doors were equipped with safety devices which could be used to seal them from the outside so that children couldn't get out. George and Minnie had no children, although Minnie was several months pregnant. Sometime that night George secured the safety locks so that the rear doors, which had been open when he bought the car, were sealed. He took Minnie out that evening, and it was very late when they returned home. Minnie had been drinking and was asleep. George put her into the back seat and

drove to the Miami River. There, in the predawn of June 1, he aimed his car at the only portion of river bank in the area not blocked by pilings or boats, a seventeen foot gap, put the machine into high gear, stepped on the accelerator, and jumped clear just as the car went into the river. His shoulder was hurt by impact with the ground, causing him to roll into the river, from which he was rescued several moments later by a boat captain roused by his shouts. Minnie, if she ever woke up, found herself trapped with windows closed and doors sealed. But that was all right, according to George, because Minnie was only a young Negro girl and the law doesn't care how many Negroes get murdered. Besides, he had committed the perfect crime, with no witnesses, as he later bragged.

This was the tale the witnesses told at the three-day first degree murder trial in November, 1958. The jury returned a verdict of guilty, with a recommendation of mercy, and the Court sentenced George to life in prison. That was eleven years ago, and as the years have passed George Milton has petitioned· and re-petitioned both Florida and Federal Courts in his efforts to overthrow this conviction. So numerous have been his court proceedings that in its response to an earlier habeas corpus petition filed in this Court, Case No. 67–234–Civ.–CF, the State despaired of its normal practice of delineating prior history of a habeas corpus claim and merely noted that such a recital in this case " * * * would unnecessarily burden this Court to wade through the matters."

Milton charges that he would not have been convicted if the State had not been allowed to introduce into evidence an oral confession, which he claims was involuntary. In the earlier habeas corpus proceeding before this Court, the State acknowledged the facts to be as petitioner alleged, and furnished a transcript of his trial, which included an extensive hearing on his voluntariness claim. Believing that all pertinent facts had been brought out at petitioner's trial, this Court considered the merits of the peti-

tion and entered an Order denying the relief sought. Because important Constitutional questions are involved, this Court certified that probable cause existed for an appeal of its Order. The Fifth Circuit Court of Appeals did not review the merits of petitioner's claim, holding instead that Milton had not exhausted his State remedies, despite the State's assertion that he had. The Court of Appeals affirmed the decision of this Court but suggested that Milton reapply for State relief. Milton v. Wainwright, 396 F.2d 214 (5 Cir. 1968). Milton has now done this. On September 3, 1968, the sentencing court denied relief under a Fla.R.Crim.P. 1.850, 33 F.S.A. motion, without hearing, having considered only the records and files in the case. Thereafter, the Florida Supreme Court refused to docket Milton's State habeas corpus petition on the ground that the rules of that Court do not require the docketing of successive petitions upon issues previously determined in that or any other Court.

This Court thus found itself in exactly the same position as it was before ruling upon the previous petition, except that this time the Court of Appeals had said ·that the available materials had a "remarkable, if not quite adequate, completeness." Milton v. Wainwright, *supra,* at 215. The State was given an opportunity to hold an evidentiary hearing and refused to do so. In view of the Appellate Court's observation that the available facts are not complete, this Court felt mandated to order an evidentiary hearing in this cause. It therefore appointed counsel for Milton and scheduled a hearing.

At the hearing both sides represented to the Court that they had carefully investigated this matter and could unearth no facts not included in the State trial court record. The State admits the facts alleged by Milton, and relies solely, on the law to sustain its position. Despite repeated questioning by the Court, counsel for Milton insisted that the record is factually complete. Therefore, the

hearing in this Court consisted entirely of legal argument.

The factual basis for Milton's involuntariness claim is simple. He was indicted for the first degree murder of Minnie Lee Claybon, also known as Minnie Milton, and was incarcerated pending trial. Archie Langford, a police officer, was placed in the cell with Milton, who was told that the officer was being held on investigation of a murder charge. The officer remained in the cell with Milton one night, the following day, and part of a second day. During that time Milton was not told of his cellmate's connection with the police force. Under instructions from his superiors, the officer questioned Milton as opportunities presented themselves in an effort to elicit from him evidence concerning the crime. The testimony of this police officer as to statements made to him by Milton during this period of joint incarceration comprises the oral confession which Milton charges was involuntary.

■ Milton argues that the oral confession was inadmissible because it was obtained by coercive methods and, therefore, involuntarily given. This allegation was exhaustively heard and determined adversely to Milton by the trial judge at his original trial. Under 28 U.S.C. § 2254 this determination is presumed correct. The opportunity afforded Milton at his trial to establish the alleged involuntary character of the confession comported fully with the most recent decisions outlining the requirements of due process.

In Jackson v. Denno, 378 U.S. 368, 376–377, 84 S.Ct. 1774, 1780–1781, 12 L.Ed.2d 908 (1964), the United States Supreme Court emphasized:

> the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced

by the truth or falsity of the confession.

The transcript of the record in this case establishes that the trial judge heard testimony out of the presence of the jury, including direct and cross examination of the State's witness and testimony by Milton, prior to finding that the oral confession was voluntary. This testimony and finding comprises twenty-eight pages of the transcribed record. This procedure afforded to Milton at his trial in 1958 was declared by the Supreme Court in Jackson v. Denno, *supra,* to be the desirable practice for the determination of admissibility of confessions by State Courts in cases subsequent to the 1964 *Denno* decision. Milton was given the benefit of such a prior determination in 1958. Nor did the effort to comply with all requirements of due process stop at that point. When the jury was recalled, and Langford allowed to testify as to the oral confession, defense counsel was allowed to conduct an exhaustive cross examination comprising some thirty-five pages of the record. At the conclusion of closing arguments, the Court charged the jury that they should determine whether the confession was freely and voluntarily made by Milton and that if they did not determine the confession to be voluntary they should exclude such involuntary statement from their consideration of Milton's guilt or innocence, but even if voluntary it should be received and considered "with great caution," particularly if made after Milton was incarcerated and under arrest. The jury was further charged that in making their determination of the credence to be given to such confession all of the circumstances surrounding its utterance, including the motives which may have operated on Milton and including the harmony or inconsistency in itself or with other evidence in the case should be "fairly and fully" considered.

It is difficult to imagine how this trial judge could have been more zealous in his effort to follow acceptable proce-

dure in making his determination that the confession was admissible as evidence of Milton's guilt and in charging the jury in a fashion most likely to give Milton every benefit of any reasonable doubt.

Not only did the trial judge follow acceptable procedure in making his determination of the voluntary character of the confession before admitting it into evidence but the record substantiates his finding. In Davis v. North Carolina, 384 U.S. 737, 741–742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966), the Supreme Court spoke of the duty of a federal court in a collateral proceeding wherein the question whether a confession was involuntarily given is raised,

> to examine the entire record and make an independent determination of the ultimate issue of voluntariness.

The Supreme Court emphasized that although the requirement of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) that a defendant be advised of his right to counsel and given certain warnings at the outset of interrogation was declared nonretroactive by Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966),

> [this] does not affect the duty of courts to consider claims that a statement was taken under circumstances which violate the standards of voluntariness which had begun to evolve long prior to our decisions in Miranda and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

■ It thus becomes the duty of this Court to determine what those standards of voluntariness were and whether they were met in this case. The test of admissibility of confessions as voluntary has been variously stated, but the requirement basically is that a confession must be the product of rational intellect and free will rather than being induced by conduct of state officials which might tend to overbear the defendant's will to resist, thus constituting coercion. Town-

send v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Lynumn v. State of Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

■ Despite assiduous efforts by counsel appointed to represent Milton in this proceeding, this Court is simply not persuaded that Milton's confession was anything but "freely and voluntarily given" as those words were interpreted in 1958. Milton was a big, strapping heavyweight who bragged of his prowess as a boxer. He was twenty-three, young and strong. Although possessing only a sixth grade education, he could read and write. Langford didn't pressure him; in fact, the officer carefully refrained from seeming over anxious to secure information from Milton in the effort not to arouse suspicion concerning his motives. It is true that Milton was deceived by police officers into foolishly placing confidence in his cellmate. But this was his own folly. This case was tried six years before the Supreme Court indicated in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), that confessions are involuntary *per se* if induced by officers or their agents from an accused after his indictment while he is without assistance of counsel. No Court has declared *Massiah* retroactive, and this Court will not be the first to do so. Counsel for Milton argues that *Massiah* was not declared retroactive because far from stating new principles of law, it merely restated principles derived from Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). However, the *Powell* case dealt with the Sixth Amendment right to appointment of counsel in a capital case, a situation far different from this case. Milton knew what he was doing. He wasn't intimidated by the police, because he didn't even know his cellmate was a policeman. He had a lawyer who had told him not to make any statements

**934**

concerning his case, but he chose not to follow that advice.

There has been much new case law since 1958 dealing with the voluntariness of incriminating statements given by defendants. But the Dade County Police Department was confronted with a case in 1958 which it had to deal with as best it could under the law as it stood in 1958. The police would have been derelict in their duty had they failed to utilize every available means to discover the truth of the case. The crime was committed late at night, with no eye witnesses. Milton planned it that way and bragged to Langford that his was the perfect crime, without eye witnesses. The State sought its evidence as best it could. Disguising a policeman as a prisoner may not appeal to delicate senses, but neither does murder. And the deception practiced upon Milton was a time-tested tool of police investigation which, at least prior to *Massiah, supra,* was acceptable to the Courts. Young v. United States, 107 F.2d 490 (5 Cir. 1939).

Finally, it should be pointed out that even if the trial judge had excluded this oral confession, the jury would still have had the benefit of an earlier tape recorded confession by Milton, which was played twice at the trial, once out of the hearing of the jury, and subsequently in evidence. This confession was given several weeks prior to the oral confession in the jail cell. Milton was warned of his applicable Constitutional rights before he made the recorded confession. Although Milton argued at his trial that this earlier confession was also involuntary, he has not pressed that claim in this habeas corpus proceeding.

After a careful consideration of the facts of this claim and the applicable case law, this Court is led to the inescapable conclusion that Milton's confession was freely and voluntarily given. Thereupon, it is

Ordered and adjudged that this petition be and the same is hereby denied.