EFFRON, Judge
(dissenting):
The lead opinion concludes that appellant’s confession was voluntary as a matter of law. The lead further concludes that the confession may be relied upon to render harmless any error resulting from the failure of the military judge to provide an appropriate instruction regarding the destruction of important evidence. I respectfully disagree. The focus in the lead opinion on the admissibility ruling of the military judge fails to take into account the difference between: (1) the role of the military judge in determining admissibility of a confession as a matter of law, and (2) the role of the court-martial panel in assessing the voluntariness and corroboration of a confession as a matter of fact.
The military judge in the present case erred in failing to appropriately instruct the members regarding the adverse inference that may be drawn from the destruction of the brain and meninges. That instruction was directly related to the evidence relied upon by the prosecution to buttress and corroborate appellant’s confession.
In the state court proceedings that preceded appellant’s court-martial, the trial judge and the appellate court concluded that the confession was inadmissible. See 54 MJ 958, 969 (2001). Even if the military judge ruled correctly that the confession was voluntary as a matter of law, the evidence in this case raised substantial doubts about the reliability of the confession—a matter in which the ultimate decision rests with the court-martial panel, not the military judge. See Mil. R.Evid. 304(e)(2), Manual for Courts-Martial, United States (2000 ed.). Moreover, the prejudicial impact of the failure to instruct was compounded when the military judge failed to sustain defense objections to the Government’s use of the destroyed evidence, both to bolster the credibility of its expert witness and undermine the credibility of the defense expert. In light of the concerns raised by these errors, I cannot be confident that a properly instructed panel would have concluded that the confession was sufficiently reliable and corroborated to support a finding of guilty beyond a reasonable doubt.
I. Background
A. The Confession
Appellant’s family consisted of his wife and seven children, including Timothy (Timmy) Ellis, Jr., appellant’s two-and-a-half-year-old son from a prior marriage. On June 4, 1994, appellant’s wife brought Timmy, who was unconscious, to the Naval Hospital in Jacksonville, Florida. He was transferred to the University of Florida Medical Center in Jacksonville, where he died four days later.
After considering information from the initial autopsy, Detective Anthony Hickson, of the Jacksonville Sheriffs Office, Homicide Division, suspected that the death was a homicide resulting from child abuse. At his request, appellant and appellant’s wife came to the Jacksonville Sheriffs Office on June 10. After they arrived at 11:00 a.m., they were interviewed in separate locations. Although they were not allowed to move about the office area unless accompanied by an escort, they were not placed in locked rooms or in handcuffs, nor were they told explicitly that they could not leave.
Based upon the initial interviews, Detective Hickson concluded that Timmy had been in the sole care of appellant and his wife before he was brought to the hospital. He also concluded that neither appellant nor his wife had provided a satisfactory explanation for Timmy’s injuries. At that point, Detective Hickson decided to proceed with separate accusatory interviews. Appellant and *388 Ms wife, who were separately provided with Miranda warnings, each waived the privilege against self-incrimination as well as the right to consult with counsel.
As described by the Court of Criminal Appeals, Detective Hickson, in the separate interrogations of appellant and his wife, first “informed each of them that he believed there was probable cause to arrest both of them for child abuse.” 54 MJ at 959, 960. Next, he “indicated that, if both of them were arrested, their other six children would probably be removed from their home by officials from the Department of Human and Rehabilitative Services ... and temporarily placed in foster care.” Id.
Both appellant and his wife denied any pertinent knowledge. Appellant’s wife, who was interviewed first, also asked to speak to appellant. That request, which was denied initially, was granted after his interrogation in the hopes that it would lead to further information. After meeting with Ms wife for about 15 minutes, appellant indicated that he wanted to talk. He made a confession that was taped and transcribed, and which included an admission to a series of severe attacks on Timmy on June 2 and June 4.[1]
Appellant was prosecuted for his son’s death in state court in June 1995. The trial judge granted appellant’s motion to suppress his confession, the ruling was sustained on appeal, and the state terminated the prosecution. See id. at 969. In April 1996, military charges were preferred against appellant for the same offense, and were referred to trial in July 1996. See Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959)(permitting state trial after federal court acqmttal for same conduct); R.C.M. 907(b)(2)(C), Manual, supra (motion to dismiss based on former jeopardy limited to prior court-martial or federal civilian court proceedings).
At the court-martial, appellant sought to suppress his statement on the grounds that it was involuntary. With respect to the present appeal, the pertinent aspect of appellant’s motion involved the question of whether his will was overborne by Detective Hickson’s statement that the police had probable cause to arrest Mm and his wife, and that if they both were arrested, their other children would be placed in foster homes by the Department of Human and Rehabilitative Services. After receiving evidence from both the prosecution and defense, the military judge concluded that the prosecution had met its burden of proving that the confession was voluntary by a preponderance of the evidence, and ruled that the confession was admissible. With respect to Detective Hick-son’s statements to appellant and his wife about removing the children to foster homes, the military judge ruled that these remarks did not constitute either a threat or an improper promise, but served merely as an appeal to speak the truth. See id. at 963. The Court of Criminal Appeals found that although Detective Hickson’s reference to Department of Human and Rehabilitative Services could be “reasonably construed as an implied threat directed at the couple’s other children,” it did not cause appellant to confess against his will. 54 MJ at 968.
The defense vigorously challenged the voluntariness of the confession and asked the members to disregard it as unreliable and uncorroborated by the medical evidence. In support of the corroboration requirement, the prosecution relied on the disputed expert testimony. See Mil.R.Evid. 304(g), Manual, supra. The military judge instructed the members that it was their responsibility to determine whether the confession was voluntary and whether it was sufficiently corroborated.
B. Destruction of Critical Evidence
On June 9, the day after the victim died, an autopsy was performed by Dr. Margarita Arruza, an Associate Medical Examiner in the Jacksonville Medical Examiner’s Office. She concluded that the death was the result of an injury on June 4, that was not acciden *389 tal. During the course of the examination, she removed the brain and its meninges from the cranium. She sliced the brain and made a visual inspection of the material at various depths to check for infarcts—areas of dead tissue resulting from prolonged deprivation of blood. She concluded that there were none based on her unaided visual inspection, but did not conduct a confirmatory microscopic examination of the tissue. See 54 MJ at 969.
Following the autopsy, Dr. Arruza arranged for storage of the brain and its meninges pursuant to a laboratory regulation providing that specimens be maintained for at least one year. Several months later, however, the specimen container was inadvertently discarded when the laboratory was moved to a new location. See id.
At trial, appellant moved to dismiss the charges, citing R.C.M. 703(f)(2), Manual, supra, which provides, in pertinent part, with respect to evidence that has been destroyed or lost:
[I]f such evidence is of such central importance to an issue that is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to produce the evidence or shall abate the proceedings____
Appellant also relied upon the right to present a defense under the Fifth Amendment, the right to cross-examine witnesses under the Sixth Amendment, and the right to obtain witnesses under Article 46, UCMJ, 10 USC § 846. See 54 MJ at 969.
Appellant contended that the missing evidence was central to both parties, noting that the prosecution would rely on testimony about the brain tissue to establish the time of death, and the defense would rely on scientific examination of the brain to impeach the Government’s expert witnesses and to establish a defense theory as to the time and cause of death. The defense theory of the case was that the injuries had been inflicted by a baseball bat wielded by appellant’s daughter several weeks earlier, or by Timmy’s self-abusive head-banging behavior. See id. at 969-70.
Before ruling on the motion, the military judge received testimony from the prosecution’s expert, Dr. Arruza, and the defense expert, Dr. Charles Odom, a medical examiner with the Dallas County (Texas) Medical Examiner’s Office. As summarized by the Court of Criminal Appeals:
Both experts agreed that a microscopic examination of the missing evidence, particularly the meninges, could have pinpointed the approximate timeframe of when the injury occurred. But they agreed, too, that a microscopic examination of the skull fracture, which was preserved, and available for defense -examination could also help to narrow down the time-frame of the injury.
54 MJ at 970. The military judge denied the defense motion, ruling that the defense had failed to meet its burden in terms of showing that the missing evidence was apparently exculpatory and that comparable evidence was not reasonably available. See id. (applying the constitutional test set forth under California v. Trombetta, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). To address the problem caused by the loss of the evidence, the military judge also ruled that the prosecution could not state or infer that because Dr. Arruza had the opportunity to examine the missing tissue, her testimony should be given more weight than testimony of the defense experts. See id.
During the prosecution’s case-in-chief, Dr. Arruza testified that her gross examination of the child’s skull and the missing tissues placed the date of injury at June 4, and stated that she had believed a microscopic analysis would lead to the same result. Dr. Arruza further testified that she conducted a microscopic examination of the fracture two and a half years after performing the autopsy, and determined that she had misdated the fracture, and that it was actually three to six weeks old. However, Dr. Arruza concluded the skull had been refractured and the new injury was consistent with being four days old.[2]
*390 The defense expert, Dr. Odom, testified that his unaided visual observation of the skull indicated that it had been fractured approximately three weeks prior to death, and that his opinion was confirmed when he microscopically examined the skull. Based on his examination of the skull fracture, medical records, and autopsy photographs taken of the destroyed brain evidence, Dr. Odom concluded that Timmy’s death was caused by a subacute subdural hematoma—a blood clot in the space between the brain and dura— which had began to liquify and re-bleed, causing irritation to, and swelling of, the brain. Dr. Odom further stated that the subacute subdural hematoma was two to three weeks-old at the time of death. He added that he would have expected a microscopic examination of the missing brain tissue to confirm his gross observations had he been able to conduct such an examination.
During cross-examination, trial counsel repeatedly challenged the reliability of Dr. Odom’s testimony by obtaining an acknowledgment from Dr. Odom that he would not stake his professional reputation on his analysis of the timeframe in the absence of a microscopic examination of the missing tissue. During closing argument, trial counsel returned to this theme, suggesting to the members that they could not rely on Dr. Odom’s testimony because “he is evidently not one to stake his reputation on it[.]” Trial counsel urged the members to reject the defense theory based on Dr. Arruza’s testimony that “she did not see any evidence of a subacute or chronic subdural hematoma[,] ... that such evidence would be visible on inspection, and she didn’t see it.” The military judge did not sustain defense counsel’s objection to the prosecution’s exploitation of the missing evidence.
With respect to the missing evidence, the military judge instructed the members that they could not give less weight to the testimony of Dr. Odom solely because he did not have the same opportunity as Dr. Arruza to examine the missing specimen. He also stated that they could consider Dr. Odom’s opinion as to what he would have expected the microscopic examination to show, even though the specimen was unavailable.
Defense counsel asked the military judge to address the harm caused by the missing evidence by giving an adverse inference instruction, permitting the members to infer a fact against the Government’s interest if the Government lost or destroyed evidence whose content or quality was at issue. Such an instruction would have permitted, but not required, the members to draw an inference against the Government’s theory of the time of death. The military judge declined to give the requested instruction.
II. Discussion
A. The Confession
As the lead opinion notes, a confession may not be introduced against the accused unless it was provided voluntarily, U.S. Const, amend. V; Article 31(d), UCMJ, 10 USC § 831(d), a determination which is based upon the totality of the surrounding circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Statements by law enforcement officials about consequences for family members may render a statement involuntary, depending on the totality of the circumstances. Compare Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963)(con-fession deemed involuntary when police advised defendant that if she did not cooperate, state financial aid for the children would be terminated and the children would be taken from her), with United States v. Moreno, 36 MJ 107, 112 (CMA 1992)(confession not involuntary when made to a social worker, who was not part of a law enforcement investigation, when appellant faced choice between cooperating with a social worker, or not cooperating and facing a greater risk of losing his children). We specifically recognized in Moreno that other “circumstances involving threats, promises, or other inducements” could “raise questions of the voluntariness of an accused’s statements to a social worker or other similarly situated person.” Id. In *391 general, the courts have approached such cases with a focus on the facts of each individual case. In a number of eases, the courts have determined that the facts rendered a confession involuntary. See, e.g., United States v. Tingle, 658 F.2d 1332 (9th Cir.1981); Hall v. State, 255 Ind. 606, 266 N.E.2d 16 (1971); People v. Rand, 202 Cal.App.2d 668, 21 Cal.Rptr. 89 (1962). In other cases, the courts have determined that the facts did not amount to unlawful coercion. See, e.g., United States v. Murray, 45 MJ 554 (N.M.Ct. Crim.App.1996); United States v. Vandewoestyne, 41 MJ 587 (A.F.Ct.Crim.App.1994).
In the present case, the law enforcement officials discussed placing the couple’s children in foster homes for a specific purpose— “to pressure them into providing additional information as to the cause of Timmy’s” death. See 54 MJ at 968. They did not raise the specter of removing the children for a beneficial or neutral purpose.
Under these circumstances, the case presents a very close question as to whether appellant’s confession was involuntary— whether he confessed not because he was guilty, but rather, to assume the sole blame, thereby exonerating his wife so that the children could remain with her. In the state court proceedings against appellant, the trial judge ruled that the confession was inadmissible, and that ruling was sustained on appeal; however, the military judge and the Court of Criminal Appeals came to a different conclusion. Assuming, without deciding, that the judicial rulings in the present case were correct as a matter of law, such rulings do not resolve the issue of whether the confession was reliable—an issue committed by law to the members of the court-martial panel under Mil.R.Evid. 304(e)(2), Manual, supra. See also Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). The closeness of the question as to the reliability of the confession is highly relevant to the issue considered next—whether any error by the military judge in fashioning a remedy for the missing evidence was harmless beyond a reasonable doubt.
B. Destruction of Critical Evidence
The primary rule at issue in this case is R.C.M. 703(f)(2), Manual, supra, which governs the relief a party may seek when evidence that is of “central importance to an issue” is “destroyed, lost, or otherwise not subject to compulsory process.” The applicable precedent interpreting R.C.M. 703(f)(2) is United States v. Manuel, 43 MJ 282, 288 (1995), in which we concluded that in R.C.M. 703(f)(2), the President granted safeguards to a military accused beyond the minimal requirements required by Article 46, UCMJ, or by the Constitution under Trombetta. The rule does not include a requirement to show that the evidence was lost or destroyed as a result of the Government’s bad-faith. We emphasized that the “rule gives the court discretion to fashion an appropriate remedy if lost evidence is of such central importance to an issue that is essential to a fair trial.” Manuel, 43 MJ at 288 (emphasis and internal quotations omitted). The question before us is whether the military judge in this case fashioned an appropriate remedy.
In the present case, there was substantial prejudice to the rights of the accused as a result of the destruction of the evidence. The central issue at trial was the time of the injury that caused Timmy’s death. The prosecution endeavored to show that the injury occurred four days before death. The defense expert testified that the injury likely occurred three weeks before death. The military judge permitted the prosecution to attack the credibility of the defense expert by emphasizing the fact that the expert had not examined the missing specimen. As a result, the military judge significantly diminished the effect of his prior remedial ruling which, in order to cure any prejudice to the defense resulting from the destruction of the brain evidence, had prohibited such questioning.
The military judge also permitted trial counsel in closing argument to bolster the credibility of the government’s expert by emphasizing her access to, and examination of, the missing specimen. In addition, the military judge denied repeated defense requests for an adverse inference instruction. Even if the initial ruling of the military judge deny *392 ing the motion to dismiss was correct, the subsequent proceedings reflected a failure to take appropriate corrective action to remedy the problems posed by the destruction of this critical evidence.
C. Harmless Error Analysis
The military judge had a number of remedial actions available to address the problem of the missing evidence, to include an adverse inference instruction. The record, however, contains defense requests for both an adverse inference instruction and other relief, and the military judge’s denials. If the military judge did not wish to phrase the instruction precisely as proposed by the defense, he was obligated under R.C.M. 703(f)(2) and Manuel to give an appropriate instruction, which he did not do. Moreover, the military judge further erred by failing to sustain defense objections to trial counsel’s improper argument.
The lead opinion concludes that any errors in this case were rendered harmless by the admission of appellant’s confession. I respectfully disagree.
A military judge’s ruling on the voluntariness of a confession as a matter of law does not answer the question as to its truthfulness as a matter of fact. “A [trial judge’s] finding that the confession is voluntary prior to admission no more affects ... the jury’s view of the reliability of the confession than a finding in a preliminary hearing that evidence was not obtained by an illegal search affects ... the jury’s view of the probativeness of this evidence.” Jackson v. Denno, 378 U.S. 368, 386 n. 13, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); see also Mil.R.Evid. 304(e), Manual, supra; United States v. Meade, 20 USCMA 510, 513, 43 CMR 350, 353 (1971).
If a reviewing court finds that there is an error at trial, that error cannot be deemed harmless by reliance on a confession that has been challenged on voluntariness grounds before the members without first considering the impact, if any, of the error on the members’ determination of the confession’s actual truth. Mere admission of a confession does not establish its reliability. See, e.g., Mil.R.Evid. 304(e)(2); Crane, 476 U.S. at 689, 106 S.Ct. 2142. In the present case, there are three theories, based upon the prosecution’s evidence and arguments at trial, under which the members could have convicted appellant: (1) the members concluded that appellant’s confession and the prosecution’s expert testimony were both credible and permitted a finding of guilty beyond a reasonable doubt; (2) the members concluded that although the confession was unreliable, the prosecution’s expert testimony permitted a finding of guilty beyond a reasonable doubt; or (3) the members concluded that the confession was credible, and the prosecution’s expert testimony was not sufficiently credible on its own to permit a finding of guilty beyond a reasonable doubt but was sufficient to corroborate appellant’s confession.
We have no way of knowing which theory was employed by the members to convict appellant. What is significant on appeal is that each theory relies on the testimony of the prosecution’s expert, Dr. Arruza. The prosecution did not present other independent evidence of appellant’s guilt. See 54 MJ at 970 (“The Government maintained that the medical evidence would corroborate ... appellant’s admission that he had fatally injured his son on 4 June 1994”). Accordingly, any harmlessness analysis must consider the impact on the members’ ultimate credibility determinations flowing from trial counsel’s improper use of the missing evidence to bolster Dr. Arruza’s testimony, and undermine the credibility of the defense expert, Dr. Odom. Similarly, we must consider the impact of the military judge’s failure to give an adverse inference instruction.
The lead opinion assumes that there is a fourth theory under which the members could have convicted appellant. The opinion is based on the assumption that the members disregarded the expert testimony concerning the time of death derived by the Government’s expert from the missing evidence, and that they focused solely on the expert testimony regarding other injuries as the basis for determining that the confession was reliable. This theory is not viable. Nothing occurred at trial to signal to the members that they should disregard Dr. Arruza’s con *393 elusions drawn from her examination of the brain and focus solely on the other injuries for purposes of evaluating the confession. On the contrary, the evidence regarding the brain was the central focus of the Government’s case and the Government’s arguments on findings.
In the present case, the issue of voluntariness was so close that state judges at both the trial and appellate level determined that appellant’s confession was inadmissible. In making our determination as to whether the errors in the present case were harmless beyond a reasonable doubt, it is inappropriate to rely on a theory which requires us to assume that the members, in reaching a decision on reliability, were not substantially influenced by evidence central to the prosecution’s case.
The Government bears the burden of demonstrating that the errors in this case did not substantially influence the members’ verdict. United States v. Moolick, 58 MJ 174, 177 (2000). The possibility that the members ignored the central evidence in the case and convicted appellant based on a theory that was not presented to them is too speculative to uphold a conviction on grounds of harmlessness beyond a reasonable doubt. In that regard, it is noteworthy that the members rejected the Government’s argument that appellant murdered his son, convicting him of a lesser included offense— involuntary manslaughter—notwithstanding the brutality described in the confession.[3] There is a significant possibility that the members placed considerable reliance on Dr. Arruza’s testimony to resolve any doubts they had as to the timing of Timmy’s fatal head injury. The Government bears the burden of negating this possibility if the conviction in this case is to be sustained on grounds of harmless error. Id. The Government has failed to do so. In the context of the very close question presented to the members as to voluntariness of the confession, and in light of the interlocking nature of the prosecution’s evidence and argument on the confession and the expert testimony, the military judge’s failure to take appropriate corrective action was not harmless beyond a reasonable doubt.

. Appellant confessed to attacking his son twice by slamming the child’s head against the ground, first on June 2, against the tile floor in the bathroom, and a second time on June 4, against the concrete garage floor. In the present case, the Government took the position each confession was true, and charged appellant with committing both acts.

. Dr. Arruza conducted the microscopic examination of the skull, at the request of the defense, *390 after learning the defense expert, Dr. Odom, had determined the fracture was three weeks old by gross examination of autopsy pictures of the skull specimen.

. Appellant was charged with the unpremeditated murder of his son under one of two theories: (1) murder with intent to kill, or (2) murder by "inflicting great bodily harm,” the latter requiring the members to find that appellant engaged in acts which were “inherently dangerous ... and evinced a wanton disregard for human life, and that [appellant] knew that death or great bodily harm [to his son] was a probable consequence of the act.”