**UNITED STATES of America**

v.

**Ana COSME, Defendant.**

**Criminal No. 06–10081–NMG.**

United States District Court,
D. Massachusetts.

March 16, 2007.

Antoinette E.M. Leoney, United States Attorney's Office, Boston, MA, for Plaintiff.

John Salsberg, Ryan M. Schiff, Salsberg & Schneider, Boston, MA, for Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

The defendant challenges the admissibility of certain statements that the government intends to offer at trial on the grounds that they were obtained involuntarily and in violation of the *Miranda* Rule. The government opposes that motion.

### I. *Background*

#### A. Factual Background

On March 29, 2006, Rolando Gonazlez, Ana Cosme and Oscar Pena were indicted for armed robbery of a bank in Lawrence, Massachusetts. On June 21, 2006, the government filed a superseding indictment adding allegations against a fourth defendant, Hector Javier Sevilla.

The indictment alleges that Cosme had been employed for several years as a teller at a branch of TD Banknorth on South Broadway in Lawrence. At some point she became romantically involved with Gonzalez. Beginning in approximately November, 2005, Cosme responded to questions by Gonzalez about the bank's operating procedures. On January 31, 2006, two masked men, allegedly Gonzalez and Sevilla, robbed the bank at gunpoint just after an armored-car delivery. They stole approximately $450,000.

Defendant Cosme is charged with the following offenses: Conspiracy to commit armed bank robbery in violation of 18 U.S.C. § 371 (Count One); armed bank robbery in violation of 18 U.S.C. §§ 2113(a) and (d), and aiding and abetting

thereof in violation of 18 U.S.C. § 2 (Count 2); and use of a firearm during a crime in violation of 18 U.S.C. § 924(c)(1)(A) and aiding and abetting thereof (Count Three).

## B. Procedural History

On October 10, 2006, defendant Ana Cosme filed a motion to suppress statements made to law enforcement agents during three interviews that took place on February 1, 2 and 15, 2006 on the grounds that such statements were obtained involuntarily and in violation of the *Miranda* Rule.

In opposition, the government contends that the defendant was cooperative and that her statements were not coerced. The first of the three subject interviews took place on February 1, 2006, in the branch office of the bank where the robbery occurred and where Cosme was working. The government contends that the interview was voluntary and non-custodial and that, therefore, the defendant's rights were not violated. Following that interview, Cosme was escorted to an FBI office in Methuen where agents spoke with her about ways in which she could help the investigation, such as wearing a voice recorder while attempting to place a telephone call to Gonzalez, her ex-boyfriend. Although the government does not so disclose in its opposition, testimony revealed that she was also interviewed again by two law enforcement officers, one of whom spoke with her in Spanish.

On February 2, 2006, Cosme was picked up at her home early in the morning and taken to Boston by an FBI agent for a polygraph examination. The government contends that the defendant signed a valid *Miranda* waiver and a polygraph consent form prior to that examination. The government further contends that Cosme was proficient in English and was cooperative with the investigating agents at all times.

Evidentiary hearings on the defendant's motion were held on February 28 and March 5, 2007. The government presented its evidence on the first day, and the defendant testified on the second day, after which the Court heard closing arguments.

## C. The Evidence

The government presented four witnesses, all of whom are Special Agents with the FBI: 1) Robert Rice, 2) Michael Willis, 3) Kristen Koch and 4) Kathryn Thibault. All of the agents testified that they had no trouble conversing with the defendant in English and that she never requested the aid of an interpreter, although one would have been available.

### 1. Special Agent Rice

Special Agent Rice testified that he interviewed the defendant in the bank manager's office of the TB Banknorth branch on South Broadway in Lawrence, Massachusetts on February 1, 2006 which had been robbed the previous day. Agents asked to interview the defendant both because she was a floating teller who periodically worked at the subject branch and because another teller had mentioned that Cosme had a boyfriend named "Rolando" who had been in the bank previously and that Cosme had expressed unusual interest in the details of the robbery. While the defendant was not a "suspect" at the outset of the interview, Rice testified that the agents wanted to "vet out" the boyfriend and determine if she had any information relating to the crime.

During the course of the interview, which was conducted by Rice, Special Agent Willis and a Lawrence police detective, the defendant made some suspicious and inconsistent statements. At one point, Rice and Willis stepped out of the room to discuss their interrogation. Willis, appar-

ently, felt that the defendant was not being truthful and that either she or her boyfriend may have been involved in the crime. When they went back in the room, Willis told the defendant that if she was involved in the robbery she could be facing 15–20 years in prison and that she could help herself by cooperating with the authorities. He also told her that she should do the right thing for her children because she could be separated from them if she went to prison.

At that point, the defendant stated "I'm going to come clean". Rice was, according to his testimony, "floored" by her statement because until that point, he had not suspected she was actually involved in the robbery. The agents proceeded to question Cosme about her role with Rolando and repeated the same questions several times, each time getting more information from the defendant. Cosme told the agents that she had given Rolando information about that bank's cash-handling procedures in response to "trick" questions and that he had contacted her shortly before the robbery took place. At the conclusion of the interview, the agents asked Cosme if she would be willing to cooperate with law enforcement and she responded affirmatively.

The bank interview lasted approximately two hours. At no time were *Miranda* warnings given. Although the defendant was not a suspect at the outset of the interview, Agent Rice testified that after she began making inculpatory statements, she was no longer free to leave because if she had attempted to do so, the agents would have initiated arrest proceedings. Although the agents were polite to the defendant, three law enforcement officers were present at all times during the interview with their weapons, badges and handcuffs visible.

## 2. Special Agent Willis

Special Agent Willis was also present during the interview with the defendant at the bank branch on February 1, 2006 and he substantially corroborated the testimony of Agent Rice.

After the initial interview, Agent Willis transported the defendant for more questioning to a High Intensity Drug Trafficking Area ("HIDTA") law enforcement office used by multiple law enforcement agencies for coordination of the investigation of drug-related offenses. At HIDTA, the defendant was offered food and drink but she declined. She was interviewed by two other law enforcement officers but Willis was not involved in that interview.

Willis and other agents then spoke with the defendant about ways in which she could cooperate with the government. She agreed to attempt to contact her ex-boyfriend, Gonzalez, who was believed to have been one of the two principal robbers. She also agreed to have a recording device placed on her phone. Cosme tried to call Gonzalez that evening but could not reach him. Around 10 p.m., Willis drove Cosme back to the bank (about a 25–minute drive) so she could retrieve her car and drive herself home. Cosme expressed fear for her safety because Gonzalez had been abusive to her before. Willis told her that the FBI would not tell Gonzalez that she was cooperating and gave her his cell phone number in case she ever felt in any danger.

The next morning, on February 2, 2006, Willis drove to the defendant's house. She signed a consent to search her residence and automobile and both were searched at some point that day. Willis then drove Cosme into Boston for a previously arranged and agreed-upon polygraph examination at FBI headquarters. Willis was also present during the arrest of the defendant on February 15, 2006, at which

time she was advised of the *Miranda* rights but she did not make any statements.

### 3. Special Agent Koch

Special Agent Kristen Koch was one of two law enforcement officers, the other being Detective Richard Brooks of the Lawrence Police Department, who interviewed Cosme at HIDTA on the evening of February 1, 2006. Neither officer administered *Miranda* warnings because, according to Koch, they were under the impression that the defendant was at HIDTA voluntarily for the purpose of offering cooperation. They had already been briefed by Willis on Cosme's earlier confession and asked her additional questions about her involvement with Rolando and the details she had given him about the bank. The information they received substantially corroborated her earlier statement at the bank.

### 4. Special Agent Thibault

Special Agent Thibault performed a polygraph examination of the defendant on February 2, 2006 at the FBI headquarters in Boston. Before the exam and the subsequent interview, Thibault advised the defendant of her *Miranda* rights and Cosme signed an "Advice of Rights" form stating that she was willing to talk to the officer without a lawyer. She also signed a form consenting to the polygraph examination. According to Thibault, the reading of *Miranda* warnings and obtaining a signed waiver are standard operating procedure prior to administration of a polygraph exam.

The defendant failed the polygraph test and was so informed during the subsequent interview. At some point during that interview, Thibault asked Cosme how much money she had expected to receive for her participation in the planning of the robbery, although until that point the defendant had not indicated she would receive any money. The defendant allegedly said that she "hoped to" receive as much as $30,000–50,000 but that a specific amount had never been agreed upon.

### 5. The Defendant

The defendant testified on her behalf on Monday, March 5, 2007. Much of her testimony corroborated that of the FBI agents. At no time on February 1, 2006, were *Miranda* warnings read to the defendant, although she testified that the agents were very polite and never raised their voices or touched her in an intimidating way. Cosme testified that during the second interview at HIDTA, Detective Brooks conversed with her in Spanish. When Special Agent Willis told her that she might be separated from her children if she were found to be involved in the bank robbery, Cosme became upset and decided to "come clean" because her children are very important to her. After that point in the conversation she did not feel free to leave or to terminate her discussions with the agents during the next two days.

Cosme's testimony regarding the polygraph exam on February 2, 2006, differs from that of the agents, however, in several respects. First, she said that, prior to arriving in Boston, she did not know what a polygraph test was and no explanation was given to her until Special Agent Thibault asked her to sign a waiver at the Boston FBI headquarters. Second, Cosme contends that after the conclusion of the polygraph exam, which she was told she had failed, at least one agent raised his voice to her (for which he later apologized) and accused her of lying. According to Cosme, one of the agents put words in her mouth to the effect that she expected to receive money from Gonzalez in exchange for her assistance in planning the robbery. She vehemently denied that assertion.

Cosme testified that she is 35 years old and the mother of two. She attended Lowell High School and earned a GED, which she took in Spanish. She had worked at TD Banknorth for six years prior to the robbery and had consistently received positive evaluations and promotions. In her capacity as a teller she regularly conversed with customers regarding bank transactions in both English and Spanish.

## II. *Legal Analysis*

### A. Legal Standard

### B. Applicable Standard

The defendant challenges the admissibility of her statements on the grounds that: 1) they were obtained involuntarily in violation of due process and 2) she not did receive *Miranda* warnings or validly waive her rights thereunder.

### 1. Voluntariness

 Due process requires that a conviction may not be founded, in whole or in part, upon an involuntary confession. *Jackson v. Denno*, 378 U.S. 368, 380, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The government bears the burden of proving voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The United States Supreme Court, using a totality of the circumstances analysis, has considered a variety of factors in assessing the voluntariness of confessions, including the crucial element of police coercion, the length of the investigation, its location, its continuity, and the defendant's maturity, education, physical condition and mental health. *Withrow v. Williams*, 507 U.S. 680, 693–94, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). If a statement is found to have been coerced, the "fruit of the poisonous tree" doctrine applies and all evidence subsequently derived from that statement must also be suppressed. *Oregon v. El-stad*, 470 U.S. 298, 303–04, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

### 2. *Miranda*

 Even if a statement is made voluntarily, the prosecution may not use any statement against a defendant stemming from a "custodial interrogation" unless it demonstrates the use of procedural safeguards effective to secure the Fifth Amendment privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The question of custody is determined by an objective test as to whether "a reasonable person would feel he was not free to leave and break off police questioning". *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). A *Miranda* waiver is valid only when it is made "voluntarily, knowingly, and intelligently". *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Unlike statements that are unconstitutionally coerced by the police, however, the "fruit of the poisonous tree" doctrine does not apply to statements obtained in violation of *Miranda* as long as they were made voluntarily. *Elstad*, 470 U.S. at 303–04, 105 S.Ct. 1285; *but see United States v. Byram*, 145 F.3d 405, 410 (1st Cir.1998) (holding that *Elstad* does not wholly bar the door to excluding evidence derived from a *Miranda* violation at least where the *Miranda* violation is not "merely technical, where there is a substantial nexus between the violation and the second statement, and where the second statement is not itself preceded by an adequate *Miranda* warning").

### C. Analysis

Based on the testimony summarized above, it is apparent that no *Miranda* warnings were given at any time on February 1, 2006. The government contends

that none were necessary because the interviews with the defendant were not "custodial". The question is, however, whether a reasonable person in the defendant's situation would have felt free to leave the interviews.

### 1. Bank Interview on February 1, 2006

▮ The interview at the bank began when the defendant was told by her Manager that the FBI wanted to question her. She was escorted into a room with three law enforcement officers, each of whom was armed, where the blinds were drawn and the door was shut behind her. While the bank interview may not have begun as a custodial interrogation, it certainly became one as soon as the defendant uttered the words "I'm going to come clean" and the officers continued to question her. At that point, the agents had reason to believe that the defendant was involved in the crime. She testified that she did not feel free to leave and she was correct because, according to Special Agent Rice, once she began to make inculpatory statements, she would have been subject to arrest had she tried to leave. All statements made during the bank interview after the defendant said "I'm going to come clean" will, therefore, be suppressed.

▮ Defense counsel contends that the bank interview was also coercive, relying primarily on the statement made by Special Agent Willis that Cosme might be separated from her children if she did not cooperate. Defense counsel urges the Court to consider several cases in which other courts have held that threats involving loss of custody of a suspect's children constitutes coercive behavior on the part of the police. In *Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), for example, the United States Supreme Court held that a confession was coerced after the police informed the sus-

pect that financial aid for her infant children would be cut off and her children would be taken away from her if she did not cooperate. Citing *Lynumn*, the Ninth Circuit Court of Appeals has also found that a veiled threat by police that a suspect would not see her child "for a while" if she went to prison constituted coercive conduct. *United States v. Tingle*, 658 F.2d 1332, 1335–36 (9th Cir.1981). That comment was made after an hour of interrogation and after the defendant was accused of lying while she repeatedly maintained her innocence. *Id.* at 1333.

In the instant case, the agents did not threaten to take the defendant's children from her but properly warned her that, if she was involved in the robbery, she faced a prison sentence that could result in her being separated from her children. After the first mention of prison, the defendant apparently said "I'm going to come clean". Considering the totality of the circumstances in this case, the Court finds that law enforcement officers did not engage in conduct that was sufficiently coercive to overbear the will of the defendant during the bank interview. Cosme's statements were not, therefore, involuntary.

### 2. HIDTA Interview on February 2, 2006

▮ There is no question that the subsequent interview at the HIDTA office in Methuen was a custodial interrogation. Although the defendant was not formally under arrest and was ostensibly cooperating with the authorities, she was transported to a law enforcement facility in another town where she was subjected to vigorous questioning not only about Mr. Gonzalez but also about her own alleged involvement in the conspiracy. While the evidence does not suggest that the statements made by the defendant at HIDTA were involuntary, they were obtained without the benefit of *Miranda* warnings and will, therefore, be suppressed.

### 3. Polygraph Examination

█ Special Agent Thibault testified that *Miranda* warnings were given to the defendant immediately upon arrival at the FBI office in Boston for her polygraph test and the government introduced a signed waiver of rights, the validity of which is not contested. Because the Court finds that the defendant's statements made on the preceding day were voluntary and that she made a subsequent, valid waiver of her *Miranda* rights, the "fruit of the poisonous tree" doctrine does not apply and the statements made on February 2, 2006, are, therefore, admissible. *See Byram,* 145 F.3d at 410. Defense counsel concedes that, because *Miranda* warnings were properly administered on February 2, statements made on that day are subject to suppression only if the Court determines that they resulted from previous involuntary statements, which is not the case here. In any event, although the defendant herself testified that law enforcement agents yelled at her and accused her of lying during the post-polygraph interview, the Court finds that, based upon the totality of the circumstances, the statements made on February 2, 2006, were not the product of coercion.

### ORDER

The defendant's motion to suppress (Docket No. 59) is, with respect to all statements made to law enforcement agents on February 1, 2006, after the defendant's statement "I'm going to come clean", **ALLOWED** but is, with respect to statements made on February 2, 2006, **DENIED**.

So ordered.